# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Board of Trustees of the Public School Teachers' Pension & Retirement Fund v.*
*Board of Education of the City of Chicago,*
**2012 IL App (1st) 112756**

| | |
|---|---|
| Appellate Court Caption | THE BOARD OF TRUSTEES OF THE PUBLIC SCHOOL TEACHERS' PENSION AND RETIREMENT FUND OF CHICAGO, Plaintiff-Appellant, v. THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, and MARY B. RICHARDSON-LOWRY, Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-2756 |
| Filed<br>Rehearing denied | September 28, 2012<br>October 25, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | For purposes of the Chicago Board of Education's yearly contribution to the teachers' pension fund, the amount certified by the board of trustees of the fund by the deadline date of February 28 of the year at issue as required by section 17-129 of the Pension Code was not unchangeable after that date, since the "certified" amount was subject to change based on the State of Illinois's actual contributions to the Fund. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CH-29362; the Hon. Rita Mary Novak, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |

Counsel on Appeal

William W. Leathem, of Jacobs Burns Orlove & Hernandez, of Chicago, for appellant.

Patrick J. Rocks, William A. Morgan, and Lisa D. Hugé, all of Board of Education Law Department, of Chicago, for appellees.

Panel

JUSTICE GARCIA delivered the judgment of the court, with opinion.

Justice Palmer specially concurred, with opinion.

Presiding Justice Lampkin dissented, with opinion.

**OPINION**

¶ 1   The plaintiff, the Board of Trustees of the Public School Teachers' Pension and Retirement Fund of Chicago (the Fund), appeals from the circuit court's grant of summary judgment to the defendants, the Board of Education of the City of Chicago (BOE) and Mary B. Richardson-Lowry, in her capacity as the BOE's president when suit was filed. The Fund claims the BOE was required to make its employer contribution for fiscal year 2010 to the pension and retirement fund based on actual contributions by the State of Illinois (hereinafter, the State) rather than on estimates provided in the Fund's letter of February 19, 2009, which it issued in accordance with the Illinois Pension Code (Pension Code) (40 ILCS 5/1-101 *et seq.* (West 2008)). The parties' dispute centers on the provision in the Pension Code that required the Fund, on or before February 28, to "certify to the Board of Education the amount of the required Board of Education contribution." 40 ILCS 5/17-129(c) (West 2008).[1] The parties disagree on the amount certified in the Fund's letter. The Fund contends it certified the gross amount of the BOE's contribution not reduced by the estimated contributions by the State. The BOE contends the Fund certified the net amount, the gross amount less the estimated contributions by the State.[2] The Fund's letter of February 19, 2009, set out both amounts. The circuit court granted the BOE's motion for summary judgment, ruling that the lower employer-contribution figure was the certified amount, which, once *certified*, could not be revised under the Pension Code.

¶ 2   On our *de novo* review of the grant of summary judgment to the BOE and the denial of the Fund's motion for summary judgment, we conclude the circuit court erred when it denied

---

[1]At issue is the statute as it stood prior to being amended on April 14, 2010.

[2]We note that the BOE's brief violates Illinois Supreme Court Rule 341(i) by failing to include a "Points and Authorities" section, which leaves this court without a list of "the authorities cited in the Argument." Ill. S. Ct. R. 341(i), (h) (eff. July 1, 2008).

the Fund's summary judgment motion. Under the Pension Code, the BOE's contribution to the teachers' pension and retirement fund for fiscal year 2010 had to reflect the State's actual contributions rather than estimates the Fund provided in its letter of February 19, 2009. While reasonable persons can disagree on the amount the Fund certified in its letter of February 19, the outcome here does not turn on the amount certified. Rather, this case turns on whether the employer contribution to be made by the BOE for fiscal year 2010 was subject to revision after the "certification" deadline date of February 28, 2009, provided in section 17-129(c) of the Pension Code. The BOE's reading of section 17-129(c) that an amount, once *certified*, was not subject to revision after February 28, 2009, would place that requirement in conflict with other provisions in section 17-129 of the Pension Code. The Pension Code requires "the Board of Education [to] contribut[e] at the rate required under this subsection." 40 ILCS 5/17-129(b)(ii) (West 2008). The objective of the Pension Code is to achieve assets "at 90% of the total actuarial liabilities of the Fund" by the projected year. 40 ILCS 5/17-129(b)(iii) (West 2008). Under the Pension Code, the State's contribution to the retirement and pension fund "shall be a credit against any contribution required to be made by the Board of Education." 40 ILCS 5/17-129(b)(v) (West 2008). The Fund's letter of February 19, 2009, made clear that the lower figure of the BOE's employer contribution was based on estimates of the State's contributions, which turned out to be highly inaccurate. The record establishes that the State did not make its first payment to the Fund for fiscal year 2010 until July or August 2009. Because the State's contribution for fiscal year 2010 could not have been known by the Fund before the start of the fiscal year, the legislature could not have intended the BOE's employer contribution, certified by the Fund, to be set in stone for the upcoming fiscal year if not revised by February 28, 2009. Rather, the Pension Code only required the Fund to "certify" that its determination of the BOE's employer contribution was based on "actuarial tables and other assumptions *** of the actuary." 40 ILCS 5/17-129(c) (West 2008). Stated differently, the Fund had to "certify" that the amount of the BOE's contribution was reached by actuarial analysis, the underlying basis of which the BOE was to receive. Whether the certified amount was the gross amount or the gross amount reduced by estimates of the State's contribution, either amount was subject to revision based on the State's actual contributions to the Fund for fiscal year 2010. The former amount was subject to decrease while the latter amount was subject to increase, but after the subtraction or addition of the actual contributions by the State, the difference and sum would be the same. To be clear, we hold that the deadline date of February 28, 2009, set forth in section 17-129(c) did not set immutably the BOE's employer contribution for fiscal year 2010. Once the State's actual contributions became known for fiscal year 2010, the Fund acted within its fiduciary duty under the Pension Code to seek the employer contribution from the BOE on the basis of the contributions the Fund actually received from the State. We reverse with directions that summary judgment be entered in favor of the Fund.

¶ 3                                   BACKGROUND

¶ 4        The Public School Teachers' Pension and Retirement Fund of Chicago was created by the Illinois legislature to administer the pension and retirement fund for Chicago public school teachers and other members. The Pension Code provides that the Fund's revenue shall

be comprised of contributions from at least four sources: (1) deductions from teachers' salaries; (2) employer contributions; (3) appropriations from the State, and (4) earnings on investments. 40 ILCS 5/17-127 (West 2008). Under the Pension Code, the employer is "The Board of Education and [any duly authorized] charter school." 40 ILCS 5/17-105.1 (West 2008). In addition to the contributions from the four sources, the Pension Code also provides for additional and employer contributions "intended to offset a portion of the cost to the Fund of the increases in retirement benefits resulting from" amendatory acts in 1998. 40 ILCS 5/17-127(b), 17-127.2 (West 2008).

¶ 5    The Pension Code requires the Fund to determine the amount of the BOE's required contributions for each fiscal year based on actuarial tables and other assumptions to meet the funding plans established by statute. 40 ILCS 5/17-129(c) (West 2008). The fiscal year for the Fund runs from July 1 to June 30 of the following year. 40 ILCS 5/17-108 (West 2008). Pursuant to the Code, on or before February 28, the Fund must "certify to the [Chicago] Board of Education the amount of the required Board of Education contribution for the coming fiscal year." 40 ILCS 5/17-129(c) (West 2008).

¶ 6    The dispute between the parties began with the February 19, 2009 letter issued by the executive director of the Fund in compliance with section 17-219(c) of the Pension Code. We excerpt that portion of the letter that addresses the BOE's employer contribution:

> "*Board of Education Required Contribution.*
>
> As of June 30, 2008 the ratio of the actuarial value of assets to the total actuarial liability is 79.7%. Using the results of the June 30, 2008 valuation as a starting point and assuming the Board pays the required contribution in Fiscal Year 2009, the actuary has projected the ratio of the actuarial value of assets to the total actuarial liability as of June 30, 2009 to be 78.7%. Thus, on the basis of the funding plan established by Public Act 89-15 as revised by Public Act 90-548, the actuary has calculated the total employer required contribution for Fiscal Year 2010 to be $393,266,000. State appropriations are estimated to be $65,000,000. Additional contributions under Section 17-127 of the Pension Code amount to $10,058,000 and additional Board of Education contributions under Section 17-127.2 of the Pension Code amount to $10,723,000. Thus, based on the contribution, the net Board of Education contribution requirement for Fiscal year 2010 under the funding plan specified in Section 17-129 of the Pension Code is calculated to be $307,485,000." (Emphasis in original.)

¶ 7    The BOE contends that based on the February 19 letter, "the Fund certified to the Board of Education that its Employer Contribution was $307,485,000," which it paid.

¶ 8    On the other side of the amount-certified dispute, the Fund asserts in its main brief that the executive director's letter of February 19, 2009, "certified to the BOE that 'the actuary has calculated the total employer required contribution for the Fiscal Year 2010 to be $393,266,000.' "

¶ 9    The letter also addressed the additional BOE contributions pursuant to section 17-127.2 of the Pension Code. 40 ILCS 5/17-129 (West 2008). There is no disagreement between the parties regarding the figure provided for the additional contribution. The letter states:

> "*Additional Board of Education Contributions.*

According to Section 17-127.2 of the Pension Code, the Board of Education shall make additional contributions of .58% of each teacher's salary to the Fund to offset a portion of the cost of benefit increases enacted under Public Act 90-582, except that no additional contributions are required if for the previous fiscal year the ratio of the fund's assets to total actuarial liabilities was at least 90%.

As the funded ratio as of June 30, 2008 is 79.7% additional Board of Education contributions will be required for Fiscal Year 2010. Based on a projected payroll of $1,978,286,000 for Fiscal Year 2010, we have determined the additional Board of Education contribution under Section 17-127.2 of the Pension Code to be *$10,723,000.*" (Emphasis in original.)

¶ 10    The Fund's February 19, 2009, letter attached a 25-page "Actuarial Valuation" of the assets and liabilities of the teachers' retirement and pension fund. The pension fund valuation report stated that as of June 30, 2008, "[t]he ratio of the actuarial value of assets to the actuarial liability, or funded ratio, is 79.7%." The report determined "the additional State contributions under Section 17-127 of the Pension Code to be $*10,058,000.*" (Emphasis in original.) The report stated, "State appropriations are estimated to be $65,000,000." The report concluded: "Thus, based on the total employer required contribution for Fiscal Year 2010 and other sources of employer contribution, the net Board of Education contribution requirement for Fiscal Year 2010 under the funding plan specified in Section 17-129 of the Pension Code is calculated to be $307,485,000."

¶ 11    On August 14, 2009, the executive director of the Fund sent the BOE a letter that "serve[d] to amend the February 19, 2009 notification sent to [the BOE] for the required employer contribution to be made to the Pubic School Teachers' Pension and Retirement Fund of Chicago (CTPF) for Fiscal Year 2010." The letter explained that the appropriations were reduced from an estimated amount of $65 million to $32,500,000, and the additional contribution from the State under section 17-127 was reduced from $10,058,000 to $5,029,000. As a result, "the net Board of Education contribution requirement for Fiscal Year 2010 specified in Section 17-219 of the Pension Code is calculated to be $345,014,000 or an increase of $37,529,000 from the estimate on February 19, 2009." The Fund asserted that because its letter of February 19, 2009, made clear the BOE's contribution was based on estimated contributions from the State, "the entire $345,014,000 [from the BOE] becomes due by June 30, 2010."

¶ 12    In its responsive letter of August 27, 2009, the BOE rejected the Fund's assertion that $345,014,000 was due. The BOE asserted the basis for its rejection: "Nothing in the language of Section 17-219c suggests that the [Fund] has the authority–after February 28, 2009–to make an additional or amended certification to [the BOE] for fiscal year 2010."

¶ 13    In its complaint filed July 8, 2010, the Fund sought declaratory judgment, injunctive relief, and a writ of *mandamus*, triggered by the BOE's failure to deposit with the Fund the employer contribution demanded. The complaint alleged that the Fund "sent its certification of the required Employer Contribution" to the BOE in the gross amount of $393,266,000. The complaint alleged that the certification letter "provided an estimate of the amounts [the Fund's executive director] thought the State might appropriate for the Fund." The actual

appropriations would "be a credit [under section 17-129(b)(v)] against any contribution required to be made by the [BOE]." The complaint characterized its August 14, 2009, letter to the BOE as setting forth "a revised estimate of the amount *** the State might appropriate for the Fund in Fiscal Year 2010." The complaint alleged that the gross amount of the BOE's contribution of $393,266,000 did not change; only the "credit" the BOE would receive based on the State's actual appropriations was revised downward. Ultimately, the complaint alleged that the State actually appropriated $34,422,116.74, resulting in a total contribution due from the BOE of $358,843,883.26. According to the complaint, the BOE had contributed $307,485,00, plus the additional contribution amount of $10,723,000, leaving a balance due of $40,635,883.26, which should have been paid by June 30, 2010, the end of the fiscal year.

¶ 14　　　The Fund filed its motion for summary judgment, contending it certified the gross amount of employer contribution due from the BOE for fiscal year 2010 to be $393,266,000. This gross amount was then reduced by the actual contribution by the State and the amount contributed by the BOE, leaving a balance due from the BOE of $37,716,141.59.[3] The circuit court denied the Fund's motion and granted the BOE 14 days to file its own motion for summary judgment.

¶ 15　　　In its motion for summary judgment, the BOE contended the Fund's letter of February 19, 2009, certified "the Board of Education's required contribution for fiscal year 2010 to be $307,485,000," which was not subject to revision under the Pension Code. The circuit court adopted the BOE's position. The court determined that the amount certified was the amount the BOE would be required to contribute based on estimates of the State's contributions as set forth in the Fund's letter of February 19, 2009, its only communication before the Pension Code date of February 28, which could not be revised under the Pension Code. The circuit court granted the BOE summary judgment on each count of the Fund's complaint.

¶ 16　　　　　　　　　　　　　　ANALYSIS

¶ 17　　　The BOE contends "the Fund's deadline to certify the Employer Contribution is February 28." Premised on a "deadline to certify," the BOE argues, "Section 5/17-219(c) does not allow the Fund to amend its demand after February 28; nor does it allow the Fund to seek 'an increase' in payment from 'the estimate' in the same fiscal year. *** Consequently, the Fund was bound by the $307,485,000 figure, the amount it had certified on February 19, 2009."

¶ 18　　　Adopting a less binding meaning to the term "certify," the Fund contends the primary question before this court is, "What was 'the amount of the required Board of Education contribution' that IPC § 17-129(c) required the Fund to 'certify' to BOE before February 28, 2009 for the coming FY 2010?" The Fund asserts that amount was $393,266,000. The Fund does not contend the BOE was required to contribute the gross amount for fiscal year 2010 as the "certified" amount; the Fund contends that amount was subject to be decreased by the State's actual contributions to the Fund during fiscal year 2010 under subsection 17-

---

[3]This amount reflects an additional payment from the State of $2,919,741.67 received by the Fund in July and August 2010 for the 2010 fiscal year, but after the fiscal year ended on June 30, 2010, and after the filing of the complaint.

129(b)(v).

¶ 19    Thus, only the BOE contends the term "certify" binds the Fund as to the BOE's employer contribution for fiscal year 2010 if not revised by February 28, 2009, which the circuit court adopted in granting the BOE summary judgment. It therefore follows that in order for the BOE to prevail under our *de novo* review, the net amount the Fund "certified" for fiscal year 2010, as the BOE contends, must be immutable after February 28, 2009.

¶ 20    The parties agree that our review is *de novo*. *De novo* review applies to questions of statutory construction. *In re Andrew B.*, 237 Ill. 2d 340, 348 (2010). It was the construction of section 17-129(c), as urged by the BOE and adopted by the circuit court, that served as the predicate for the grant of summary judgment to the BOE, which is also subject to *de novo* review. *Emerald Casino, Inc. v. Illinois Gaming Board*, 346 Ill. App. 3d 18, 23 (2003).

¶ 21    Section 17-129(c) provides:

"The Board [of Trustees of the Fund] shall determine the amount of Board of Education contributions required for each fiscal year on the basis of the actuarial tables and other assumptions adopted by the Board [of Trustees of the Fund] and the recommendations of the actuary, in order to meet the minimum contribution requirements of subsections (a) and (b). Annually, on or before February 28, the Board [of Trustees of the Fund] shall certify to the Board of Education the amount of the required Board of Education contribution for the coming fiscal year. The certification shall include a copy of the actuarial recommendations upon which it is based." 40 ILCS 5/17-129(c) (West 2008).

¶ 22    "Certify" in Black's Law Dictionary means "To authenticate or verify in writing." Black's Law Dictionary 220 (7th ed. 1999).

¶ 23    The question we first address is what the legislature required the Fund to verify or authenticate when it required the Fund to "certify to the Board of Education the amount of the required Board of Education contribution." 40 ILCS 5/17-129(c) (West 2008). In other words, did the term "certify" transform, as of February 28, 2009, the amount the Fund disclosed to the BOE into an immutable employer-contribution amount due from the BOE for fiscal year 2010? Our answer is no.

¶ 24    The BOE's contention that upon "certification" of the BOE's contribution in the Fund's letter of February 19, 2009, that contribution amount was not subject to revision after February 28, as the BOE reads section 17-129(c), would undermine other provisions of the very same section of the Pension Code. The legislature could not have intended the term "certify" to transform the amount of employer contribution by the BOE, as determined by the Fund, to preclude revision of that figure after February 28 given that subsection 17-129(b)(v) expressly provides for "a credit" against the BOE's employer contribution based on the State's contribution for the same fiscal year. 40 ILCS 5/17-129(b)(v) (West 2008) (State's contribution "shall be a credit against any contribution required to be made by the Board of Education"). Rather, the term "certify" referenced the process by which the BOE's contribution was determined by the Fund.

¶ 25    The language in section 17-129(c) required the Fund to determine the BOE's contribution "on the basis of actuarial tables and other assumptions adopted by the Board and the recommendations of the actuary" with the stated goal of meeting "the minimum contribution

requirements of subsection (a) and (b)." 40 ILCS 5/17-129(c) (West 2008). The term "certify" was directed at the Fund's obligation to verify or authenticate by "actuarial tables," "assumptions adopted by the Board," and "recommendations of the actuary," the BOE's employer contribution for fiscal year 2010. This meaning of "certify" explains the requirement that the "actuarial recommendations" be included. "The certification shall include a copy of the actuarial recommendations upon which it is based." 40 ILCS 5/17-129(c) (West 2008). Use of the noun "certification" in this last sentence conveys that it is not the precise amount of employer contribution that is being "certified," but rather the process by which the Fund determined the BOE's employer contribution. The Fund must "certify" that the amount of the BOE contribution required for fiscal year 2010 is based on actuarial analysis, which the Fund must disclose. *Id.* The legislature did not intend the term "certify" to transform the employer contribution the BOE must make for fiscal year 2010 into a precise figure that cannot be revised after February 28, 2009. It is a false choice to pick between the gross amount and the net amount of the BOE's contribution as the "certified" amount for fiscal year 2010.[4]

¶ 26      We premise this conclusion on the unassailable observation that the State's contribution to the Pension Fund for fiscal year 2010 could not have been known by February 28, 2009. The record is clear that the State did not make a contribution to the Fund for fiscal year 2010 until July or August 2009. It necessarily follows that to give meaning to section 17-129(b)(v) under which "a credit" of the State's contribution will apply "against any contribution required to be made by the Board of Education," the State's actual contribution must first be determined. 40 ILCS 5/17-129(b)(v) (West 2008). This leads to the inescapable conclusion that the *actual* employer contribution the BOE must make for fiscal year 2010, reduced by "a credit" for the State's contribution, could not have been determined by February 28, 2009. The legislature could not have meant to force the Fund to arrive at a precise amount of the employer contribution by the BOE by a date that the State's contribution could not have been known. *People v. Burpo*, 164 Ill. 2d 261, 267 (1995) ("Common sense must play a role in the construction of statutes."). Rather, the more reasonable interpretation of the "certify" term in section 17-129(c) is that it required the Fund to "certify" that the amount it determined was based on "the actuarial tables and other assumptions adopted by the Board and the recommendations of the actuary." 40 ILCS 5/17-129(c) (West 2008). We are unpersuaded by the reading of section 17-129(c) urged by the BOE that the Fund was

---

[4]The BOE argues that section 17-129(a), as amended effective April 14, 2010, serves as a legislatively created remedy should the Fund's "actuary's estimates [be] inaccurate." See Pub. Act 96-889 (eff. Apr. 14, 2010). We are unpersuaded that a future remedy is an adequate substitute for the contribution that the Pension Code compels be made for the then-current fiscal year. In any event, the amendment reinforces our conclusion that the term "certify" concerns the actuarial analysis and not the precise amount the BOE must contribute for the fiscal year at issue. As the BOE points out, the amendment provides for "specific amounts for the Board of Education's Employer Contributions" which is "subject still to amounts paid by the State." If fiscal year 2010 is emblematic, "amounts paid by the State" do not occur until the start of the fiscal year, well after the February 28 date in section 17-129(c).

compelled to "certify" the precise "amount of the required Board of Education contribution for the coming fiscal year" before the "credits" for the State's contributions could be known. *Matsuda v. Cook County Employees' & Officers' Annuity & Benefit Fund*, 178 Ill. 2d 360, 364 (1997) (the legislature did not intend an anomalous outcome); *Burpo*, 164 Ill. 2d at 267.

¶ 27    The BOE's reading of section 17-129(c) would also undermine other provisions in section 17-129 of the Pension Code. The Pension Code requires "the Board of Education [to] contribut[e] at the rate required under this subsection." 40 ILCS 5/17-129(b)(ii) (West 2008). It is a fallacy to conclude that an accurate contribution rate of the BOE for fiscal year 2010 can be determined when the employer contribution is determined on the basis of estimates that turn out to be highly inaccurate. *Matsuda*, 178 Ill. 2d at 366 (an interpretation must not render a statute inoperative or meaningless). Such a reading of section 17-129(c) would also place at risk the objective of the Pension Code to achieve assets "at 90% of the total actuarial liabilities of the Fund" by the projected year. 40 ILCS 5/17-129(b)(iii) (West 2008). It is fundamental for a well-funded pension system to require the BOE's employer contribution for fiscal year 2010 to be based on accurate amounts. *Matsuda*, 178 Ill. 2d at 365-66 ("the language of Illinois' pension statutes must be liberally construed in favor of the rights of the pensioner").

¶ 28    To be clear, under the construction we give to section 17-129, the Fund's letter of February 19, 2009, fully complied with subsection (c) when the Fund provided the actuarial analysis to the BOE in which the gross and the net employer contribution of the BOE were clearly explained. "The certification shall include a copy of the actuarial recommendations upon which it is based." 40 ILCS 5/17-129(c) (West 2010). The "certification" required by section 17-129(c) concerned the Fund's obligation to disclose and use actuarial analysis to determine the BOE's employer contribution. In fact, the valuation report provided in its closing paragraph precisely the "*Certification*" required by section 17-129(c). (Emphasis in original.) The employer-contribution amount determined by the Fund by actuarial analysis and provided to the BOE on February 19, 2009, before the beginning of the 2010 fiscal year was never meant to be "certified" in the sense that the amount "certified" was immutable after that date, as the BOE contends.

¶ 29    As we stated, the Fund contends it "certified" in its letter of February 19, 2009, the gross amount of $393,266,000. The Fund makes clear, however, that the gross amount is not "the amount of the required Board of Education contribution for the coming fiscal year," as the language in section 17-129(c) might suggest. The actual contribution required of the BOE is determined only after "[a]ny contribution by the State *** [is applied as] a credit against any contribution required to be made by the Board of Education." 40 ILCS 5/17-129(b)(v) (West 2008).

¶ 30    The BOE does not dispute that the amount of the "credit," as expressly provided by section 17-129(b)(v), was unavailable by February 28, 2009, for fiscal year 2010. Based on the "Rule 216 Request to Admit" filed by the BOE, the first contribution payment by the State for fiscal year 2010 was not received by the Fund until July 2009. We note that in its answer, the Fund asserted the July 2009 contribution was for fiscal year 2009 and the first payment for fiscal year 2010 was made in August 2009. For our purposes it matters not which of the two dates began the State's contributions for fiscal year 2010; our point is that

the actual contributions had to be known in order to trigger the credit provision of section 17-219(b)(v), which the record makes clear were unavailable by the statutory date of February 28, 2009.

¶ 31 We are unconvinced that the Illinois legislature would have compelled the Fund to "certify" the BOE's contribution by February 28, 2009, in the sense of once given, the amount cannot be revised, presumably neither upward, as the BOE argues, nor downward, though the BOE makes no such assertion, while requiring the State's contribution for fiscal year 2010 to serve as "a credit" against the contribution required of the BOE for that same fiscal year. In light of this unavoidable, commonsense construction of section 17-129(c), we also disagree that the legislature would have mandated estimates, upon which the Fund's letter of February 19, 2009, is clearly based, be considered the equivalent of credits of "any contribution by the State," as the Pension Code expressly provides.

¶ 32 In sum, construing section 17-129 in its entirety, based on its plain and ordinary language, regardless of whether it might have been written more clearly, the legislature could not have intended that by February 28, 2009, the Fund had to determine the precise employer contribution of the BOE for fiscal year 2010 when section 17-129 also provided "a credit" against the BOE's contribution based on any pension contribution by the State, which could not be known by the date set forth in the section. We do not hesitate to find that the construction urged by the BOE would render the "credit" portion of section 17-129(b)(v) meaningless. *Matsuda*, 178 Ill. 2d at 366 (an interpretation must not render a statute inoperative or meaningless). The BOE's construction would also undermine the Pension Code requirements that the BOE contribute at the required rate to meet the stated aim to bring the Fund's ratio of assets to actuarial liabilities to 90% by the projected year. See *Andrew B.*, 237 Ill. 2d at 348 ("We must consider the entire statute in light of the subject it addresses, presuming the legislature did not intend absurd, unjust, or inconvenient results.").

¶ 33 In practical terms, it made no difference whether the gross amount of $393,266,000, as the Fund asserts, or the net amount of $307,485,000, as the BOE asserts, was "certified." Either number was subject to revision upon application of the "credit" provision of section 17-129(b)(v). The lower amount, which the BOE preferred, was subject to be increased based on the actual contributions made by the State and the additional contributions required of the BOE and the State. The higher amount was subject to be decreased on the basis of the same figures, just in the opposite direction. Whichever figure is used, the sum and the difference are the same. We add that it is likely the BOE would agree with the Fund, on the issue of revision of the "certified" amount after the deadline date of February 28, if we were to conclude that the gross amount of the BOE's contribution was "certified" by the Fund.

¶ 34 We reiterate that the "certify" requirement in section 17-129(c) was never meant to set in stone the BOE's employer contribution if that amount was not revised by the Fund prior to February 28. The amount the BOE would actually have to contribute for fiscal year 2010 would have to await the State's contributions during the fiscal year, which serve as "a credit against [the] contribution required to be made by the Board of Education." 40 ILCS 5/17-129(b)(v) (West 2008).

¶ 35 The BOE was required to contribute a total amount of $355,924,141.59 for fiscal year

2010, which, after the amount the BOE paid, left a balance of $37,716,141.59, all of which is due for fiscal year 2010 as the Fund claims.

¶ 36                                              CONCLUSION

¶ 37      We reverse the grant of summary judgment to the BOE. Section 17-129(c) of the Pension Code did not render the amount of the BOE's contribution as "certified" by the Fund in its letter of February 19, 2009, unchangeable after February 28, 2009. It was the Fund that was entitled to summary judgment because the Pension Code required the employer contribution for fiscal year 2010 to be based on actual contributions made by the State as the Fund asserted in its motion for summary judgment.

¶ 38      Reversed and remanded with directions.

¶ 39      JUSTICE PALMER, specially concurring.

¶ 40      I concur in the judgment of the court that the order granting summary judgment to the defendant was in error and that summary judgment should be granted to the Fund. I write separately to note that I feel this conclusion is required by the plain language of the statute and the exercise of simple mathematics.

¶ 41      The Fund argues that it was not required by statute to estimate the State's contribution and only has done so as a courtesy and a matter of convenience, that in its certification it is clearly stated that the total employer's required contribution for fiscal year 2010 was calculated to be $393,266,000 and that it was only estimated that the State would appropriate $65 million, that the statute only gives the BOE a credit against its required contribution for any actual contribution by the State as opposed to a credit for an estimated contribution, and that the statute does not preclude an amendment to the certification once that actual credit due to the BOE is determined.

¶ 42      Upon consideration, I find the Fund's arguments to be well founded and that it is unlawfully being deprived of a $37,529,000 contribution that is rightfully owed to the Fund, and that the BOE is enjoying an unfair windfall in that amount. In my view, as noted, the answer to this puzzle is found in the plain language of the relevant statute and in simple mathematics.

¶ 43      As a starting point, at the relevant time the Pension Code provided in section 17-129(b)(i) through (iv) the method by which the minimum contribution by the BOE was to be calculated. 40 ILCS 5/17-129(b)(i), (b)(ii), (b)(iii), (b)(iv) (West 2008). Then section 17-129 (b)(v) gave the BOE a *credit* against *any contribution required to be made by the BOE under this subsection (b)* for *any contribution by the State*. 40 ILCS 5/17-129(b)(v) (West 2008). A fair reading of this language can only lead to the conclusion that once the BOE's required contribution is calculated, it is only entitled to a credit against that contribution for payments the State actually appropriated. This is a sequential mathematical analysis that requires the determination of the required contribution and then the subtraction of the amount of any funds appropriated by the State.

¶ 44    Next, section 17-129(c) provided for the annual certification to the BOE of its required contribution by February 28. 40 ILCS 5/17-129(c) (West 2008). Unfortunately, due to the timing of this requirement, at the time of certification the Fund could only estimate the amount of contribution by the State. It would be illogical, against the clear language of the statute, and against its clear intent to hold that simply because the Fund was required to estimate the State's contribution that it is stuck with that estimate if the State fails to act as was expected. One might ask that if the State appropriated $0, would the Fund be required to shoulder the loss of the entire estimate of $65 million? Why should the BOE be the beneficiary of such a windfall? Common sense, historical perspective and now hindsight tell us that one can never reasonably rely on a political body to appropriate funds exactly as expected. Nor can a political body's actions accurately be predicted by an actuary. Additionally, the BOE had the additional warning in the certification letter that the State's contribution was only an estimate. This is the BOE's responsibility, only to be mitigated by payments by the State. If no payments by the State are forthcoming, then the contribution remains the BOE's responsibility.

¶ 45    Necessarily following from the facts that the BOE is only entitled to a credit for actual contributions by the State and that timing requirements force the Fund to estimate those contributions is the conclusion that the Fund must be allowed to amend its certification upon learning the actual contribution from the State. First, the statute is silent on the matter. While it is true that there is no provision for an amendment to the certification, it is also not prohibited. Most importantly, the fact that the State's contribution may fall short of estimates, and did in this case, requires that the Fund be allowed to amend so that the BOE does not reap a windfall.

¶ 46    This is just simple math and as scholars have often said, the numbers are the numbers: $393,266,000 (employer contribution) minus $32,500,000 (State's actual appropriation) minus $5,029,000 (section 17-127) minus $10,723,000 (section 17-127.2) = $345,014,000. Any other result just does not add up. I agree that the order of summary judgment granted to the BOE should be reversed and that summary judgment should be granted to the Fund.


¶ 47    PRESIDING JUSTICE LAMPKIN, dissenting.

¶ 48    I dissent from the majority's ruling. I would affirm the judgment of the trial court, which found that defendants complied with the statutory requirement to pay the timely certified amount of the BOE's required contribution for the 2010 fiscal year.

¶ 49    This appeal involves a dispute between the parties about the amount of defendants' fiscal year 2010 required contribution to a pension fund, as mandated by section 17-129 of the Illinois Pension Code (Pension Code) (40 ILCS 5/17-129 (West 2008)).


¶ 50                                    I. BACKGROUND

¶ 51    Plaintiff, the Board of Trustees (Trustees) of the Public School Teachers' Pension and Retirement Fund (Fund), is authorized to administer the Fund, which is an Illinois public employee pension fund established to pay pensions to eligible contributors, members or teachers. The Pension Code provides that the Fund's revenue shall consist of, *inter alia*,

contributions deducted from teachers' salaries, employer contributions, state appropriations, and earnings on investments. 40 ILCS 5/17-127 (West 2010). Section 17-105.1 of the Pension Code defines *employer* as "The Board of Education and a charter school as defined under the provisions of Section 27a-5 of the School Code." 40 ILCS 5/17-105.1 (West 2010). The Pension Code also provides for additional state and employer contributions, which were "intended to offset a portion of the cost to the Fund of the increases in retirement benefits resulting from" amendatory acts in 1998. 40 ILCS 5/17-127(b), 17-127.2 (West 2010).

¶ 52 The Pension Code requires the Trustees to determine the amount of the BOE's required contributions to the Fund for each fiscal year based upon actuarial tables and other assumptions in order to meet certain funding plans established by statute. 40 ILCS 5/17-129(c) (West 2010). The fiscal year runs from July 1 through June 30. 40 ILCS 5/17-108 (West 2010). Moreover, the Trustees, annually, on or before February 28, must "certify to the Board of Education the amount of the required Board of Education contribution for the coming fiscal year." 40 ILCS 5/17-129(c) (West 2010).

¶ 53 Accordingly, by a letter dated February 19, 2009, the Trustees notified the BOE of the fiscal year 2010 additional BOE contribution under section 17-127.2 of the Pension Code (40 ILCS 5/17-127.2 (West 2008)), and the BOE's required employer contribution under section 17-129 of the Pension Code (40 ILCS 5/17-129 (West 2008)). The section 17-129 contribution is the subject of this appeal.

¶ 54 In that letter, under a heading entitled "Additional Board of Education Contributions," the Trustees stated that, pursuant to section 17-127.2, which was enacted to offset a portion of the cost of benefit increases enacted in May 1998, the additional BOE contribution was $10,723,000. Furthermore, under a heading entitled "Board of Education Required Contribution," the Trustees stated that "based on the total employer required contribution for Fiscal Year 2010 and other sources of employer contribution, the net Board of Education contribution requirement for Fiscal Year 2010 under the funding plan specified in Section 17-129 of the Pension Code is calculated to be $307,485,000." The letter explained that figure resulted by deducting from $393,266,000, which was the actuary's calculated total employer required contribution for fiscal year 2010, the following amounts: $65 million in estimated state appropriations, the state's $10,058,000 section 17-127 additional contribution, and the BOE's $10,723,000 section 17-127.2 additional contribution. The actuarial report detailing the required employer contribution requirement for fiscal year 2010 was attached to the letter.

¶ 55 In a letter dated August 14, 2009, the Trustees sought to "amend the February 19, 2009 notification sent" to the BOE concerning the fiscal year 2010 required employer contribution. According to the letter, the estimated state appropriations had been reduced from $65 million to $32,500,000, and the state's section 17-127 additional contribution had been reduced from $10,058,000 to $5,029,000. As a result, "the net Board of Education contribution requirement for Fiscal Year 2010 *** [was] $345,014,000 or an increase of $37,529,000 from the estimate on February 19, 2009." The Trustees asserted that because the BOE was "notified of the required contribution on February 19, 2009[,] the entire $345,014,000 becomes due by June 30, 2010."

¶ 56 In its response letter dated August 27, 2009, the BOE argued that the Trustees did not have the authority–after February 28, 2009–to make an additional or amended certification to the BOE for the 2010 fiscal year and, thus, the BOE disagreed with the Trustees' assertion that the entire $345,014,000 was due by June 30, 2010.

¶ 57 According to plaintiff's complaint, the actual contribution the Fund received from the State for fiscal year 2010 was $34,422,116.74. By letter dated July 1, 2010, the Trustees notified the BOE that the net amount due by June 30, 2010 for fiscal year 2010 was $358,843,883.26, but that it had received only $318,208,000 from the BOE, and thus demanded payment of the balance due of $40,635,883.26 by July 7, 2010.

¶ 58 In July 2010, plaintiff filed a complaint for declaratory judgment, injunction and *mandamus*, alleging that the BOE failed to comply with the statutory requirement to pay the employer contribution amount demanded by the Fund. Specifically, plaintiff alleged that it timely certified to the BOE the total employer required contribution amount and the BOE's estimated reduced portion of that amount, which reflected a credit based on the amount of the State's anticipated contributions. Plaintiff alleged that the August 14, 2009 revised estimate of the State's contribution did not change the BOE's required employer contribution for fiscal year 2010 of $393,266,000, as calculated by the actuary and certified to the BOE in the February 19, 2009 letter. Plaintiff also argued that the BOE was entitled to receive a credit under the provisions of the Pension Code only for contributions actually made to the Fund by the State, even if those contributions were different from the Fund's estimates.

¶ 59 The Trustees moved for summary judgment on all claims, but the trial court denied that motion after oral argument. Thereafter, defendants moved for summary judgment on all counts of plaintiff's complaint on the basis that the BOE had complied with its statutory obligation under the Pension Code for fiscal year 2010. The trial court granted defendants' motion, and plaintiff appealed.

¶ 60 II. ANALYSIS

¶ 61 Plaintiff contends the trial court erred in granting summary judgment in favor of defendants because they failed to comply with their statutory requirement to pay the Fund the full amount of the total required employer contribution for fiscal year 2010. Plaintiff argues the plain language of the statute and the obvious intent of the legislature indicate that the Fund, in order to achieve the statutorily mandated 90% ratio of assets to liabilities by the year 2045, was required to certify by February 28 the *total employer contribution* amount for the fiscal year, before the application of any credits. According to plaintiff, there is no statutory support for the notion that the Fund was required to certify by February 28 the *BOE's net contribution*, which amount reflects reductions based on estimates of anticipated–but not yet received–contributions from the State. Plaintiff argues it would not make any sense to certify a credit for the BOE before the amount of the state contribution is actually received.

¶ 62 Defendants respond that the BOE's obligation to pay the employer contribution pursuant to section 17-129 depends on the Fund's compliance with section 17-129(c) of the Pension Code, which requires the Fund to certify the amount of the BOE's required contribution by

-14-

the February 28 deadline. 40 ILCS 5/17-129 (West 2010). Because no statutory provision allows the Fund to amend and increase its demand after that deadline, defendants contend that the Fund was bound by the $307,485,000 figure it had certified to the BOE on February 19, 2009. According to defendants, logic dictates that the BOE must be allowed to rely on the $307,485,000 certified figure because the fiscal year runs from July 1 through June 30 and the February 28 deadline anticipates the budget planning process for both the BOE and the Fund.

¶ 63    In appeals from summary judgment rulings, this court conducts *de novo* review and construes all evidence strictly against the movant and liberally in favor of the nonmoving party. *Tarsitano v. Board of Education of Township High School District 211*, 385 Ill. App. 3d 868, 871 (2008). Where the pleadings, depositions and affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, summary judgment should be granted. See 735 ILCS 5/2-1005(c) (West 2010); *Tarsitano*, 385 Ill. App. 3d at 871. If reasonable persons could draw different inferences from undisputed facts, summary judgment should be denied. *Atlantic Mutual Insurance Co. v. American Academy of Orthopaedic Surgeons*, 315 Ill. App. 3d 552, 559 (2000). The drastic means of disposing of litigation through summary judgment should be allowed only when the right of the moving party is clear and free from doubt. *Tarsitano*, 385 Ill. App. 3d at 871.

¶ 64    This court reviews *de novo* claims requiring statutory construction, which present a question of law and are appropriate for summary judgment. *Matsuda v. Cook County Employees' & Officers' Annuity & Benefit Fund*, 178 Ill. 2d 360, 364 (1997). The court's goal in construing a statute is to determine and effectuate the legislature's intent, which is best indicated by giving the statutory language its plain and ordinary meaning. *In re Andrew B.*, 237 Ill. 2d 340, 348 (2010). The court considers the entire statute in light of the subject it addresses and presumes the legislature did not intend absurd, unjust, or inconvenient results. *Id.* Courts must not read into a statute conditions, exceptions, or limitations that contravene legislative intent. *Id.*

¶ 65    Like the BOE, the Fund, which is created by statute, has only such powers as are conferred upon it by the legislature. See *Tarsitano*, 385 Ill. App. 3d at 871. The powers of the Fund with reference to certifying the BOE's required contribution to the Fund are set forth in section 17-129 of the Pension Code.

¶ 66    In 2009, the Pension Code provided, in pertinent part, that for any fiscal year ending prior to 1997, the BOE was required to "set apart and appropriate from moneys from its tax levy for educational purposes, a sum sufficient to remove [contribution deficiencies], and promptly pay such sum into the Fund in order to restore any of the reserves of the Fund." 40 ILCS 5/17-129(a) (West 2008). However, the BOE's contributions to the Fund for fiscal years after 1997 were determined as follows:

"(b)(i) For fiscal years 2011 through 2045, the minimum contribution to the Fund to be made by the Board of Education in each fiscal year shall be an amount determined by the Fund to be sufficient to bring the total assets of the Fund up to 90% of the total actuarial liabilities of the Fund by the end of fiscal year 2045. In making these determinations, the required Board of Education contribution shall be calculated each

-15-

year as a level percentage of the applicable employee payrolls over the years remaining to and including fiscal year 2045 and shall be determined under the projected unit credit actuarial cost method.

(ii) For fiscal years 1999 through 2010, the Board of Education's contribution to the Fund, as a percentage of the applicable employee payroll, shall be increased in equal annual increments so that by fiscal year 2011, the Board of Education is contributing at the rate required under this subsection.

(iii) Beginning in fiscal year 2046, the minimum Board of Education contribution for each fiscal year shall be the amount needed to maintain the total assets of the Fund at 90% of the total actuarial liabilities of the Fund.

(iv) Notwithstanding the provisions of paragraphs (i), (ii), and (iii) of this subsection (b), for any fiscal year[,] the contribution to the Fund from the Board of Education shall not be required to be in excess of the amount calculated as needed to maintain the assets (or cause the assets to be) at the 90% level by the end of the fiscal year.

(v) Any contribution by the State to or for the benefit of the Fund, including, without limitation, as referred to under Section 17-127, shall be a credit against any contribution required to be made by the Board of Education under this subsection (b).

(c) The Board [of Trustees of the Fund] shall determine the amount of Board of Education contributions required for each fiscal year on the basis of the actuarial tables and other assumptions adopted by the Board [of Trustees of the Fund] and the recommendations of the actuary, in order to meet the minimum contribution requirements of subsections (a) and (b). Annually, on or before February 28, the Board [of Trustees of the Fund] shall certify to the Board of Education the amount of the required Board of Education contribution for the coming fiscal year. The certification shall include a copy of the actuarial recommendations upon which it is based." 40 ILCS 5/17-129 (West 2008).

¶ 67    Recent amendments to the Pension Code, which became effective April 14, 2010, struck the above-quoted text of subsection (b) and added the following text:

"(b)(i) Notwithstanding any other provision of this Section, and notwithstanding any prior certification by the Board [of Trustees of the Fund] under subsection (c) for fiscal year 2011, the Board of Education's total required contribution to the Fund for fiscal year 2011 under this Section is $187,000,000.

(ii) Notwithstanding any other provision of this Section, the Board of Education's total required contribution to the Fund for fiscal year 2012 under this Section is $192,000,000.

(iii) Notwithstanding any other provision of this Section, the Board of Education's total required contribution to the Fund for fiscal year 2013 under this Section is $196,000,000.

(iv) For fiscal years 2014 through 2059, the minimum contribution to the Fund to be made by the Board of Education in each fiscal year shall be an amount determined by the Fund to be sufficient to bring the total assets of the Fund up to 90% of the total actuarial

-16-

liabilities of the Fund by the end of fiscal year 2059. In making these determinations, the required Board of Education contribution shall be calculated each year as a level percentage of the applicable employee payrolls over the years remaining to and including fiscal year 2059 and shall be determined under the projected unit credit actuarial cost method.

(v) Beginning in fiscal year 2060, the minimum Board of Education contribution for each fiscal year shall be the amount needed to maintain the total assets of the Fund at 90% of the total actuarial liabilities of the Fund.

(vi) Notwithstanding any other provision of this subsection (b), for any fiscal year, the contribution to the Fund from the Board of Education shall not be required to be in excess of the amount calculated as needed to maintain the assets (or cause the assets to be) at the 90% level by the end of the fiscal year.

(vii) Any contribution by the State to or for the benefit of the Fund, including, without limitation, as referred to under Section 17-127, shall be a credit against any contribution required to be made by the Board of Education under this subsection (b)." 40 ILCS 5/17-129 (West 2010) (amended by Pub. Act 96-889 (eff. Apr. 14, 2010)).

¶ 68    I would reject plaintiff's assertion that its February 2009 letter certified the total employer contribution amount as the BOE's required contribution for fiscal year 2010 and simply included the BOE's net contribution as a "courtesy." The plain language of the statute requires plaintiff to certify by February 28 the BOE's portion of the total employer contribution. Specifically, although section 17-129(c) of the Pension Code does not expressly make a distinction between *net* and *gross* contributions, section 17-129(c) nevertheless requires that the Fund certify to the BOE "the amount of the required *Board of Education contribution* for the coming fiscal year." (Emphasis added.) 40 ILCS 5/17-129(c) (West 2010). That certified amount will necessarily be an estimate or a projection based on the "projected unit credit actuarial cost method" (40 ILCS 5/17-129(b)(iv) (West 2010); see also 40 ILCS 5/17-129(b)(i) (West 2008)) and "actuarial tables and other assumptions adopted by the" Trustees (40 ILCS 5/17-129(c) (West 2010)). Those "other assumptions," according to the statute, include estimates of anticipated contributions from the State and earnings on investments. See 40 ILCS 5/17-127 (West 2010).

¶ 69    Because the plain language of the statute puts the burden on the Fund to calculate, by a certain deadline, the BOE's portion of the employer contribution, it is reasonable to conclude that the legislature intended the BOE to rely on the Fund's timely certified amount and the actuarial report, which gives educated estimates based on reports and data, for the given fiscal year. As stated above, the Fund has only the power conferred upon it by the legislature (*Tarsitano*, 385 Ill. App. 3d at 871), and the statute does not allow the Fund to amend a certified contribution amount for a given fiscal year after the February 28 deadline. Accordingly, the statutory scheme anticipates that any shortfalls due to erroneous estimates or reduced state appropriations will be made up in subsequent years. This hardly results in any windfall to the BOE, which is statutorily required to pay annually its timely certified portion of the employer contribution. Furthermore, because the statute does not allow plaintiff to amend, after the deadline, the BOE's timely certified contribution amount within

the fiscal year, I would necessarily reject plaintiff's assertion that the statutory provision concerning the BOE's entitlement to a credit for state appropriations (40 ILCS 5/17-129(b)(vii) (West 2010); see also 40 ILCS 5/17-129 (b)(v) (West 2008)), somehow allows plaintiff to certify tentative fiscal year contribution amounts to the BOE until the Fund actually receives the state's appropriations. The legislature easily could have written such a provision into the statute but did not do so, and I would not read that provision into the statute now.

¶ 70    In addition to my analysis of the plain language of the statute, I would also conclude, based upon the Fund's February 2009 letter and actuarial report, that the amount the Fund timely certified to the BOE of the BOE's required contribution was $307,485,000. First, although the February 2009 letter informed the BOE that the total employer contribution for fiscal year 2010 was $393,266,000, the letter concluded that the BOE's net contribution requirement was $307,485,000. Second, page 1, section A, of the report, entitled "Purpose and Summary," stated:

> "6. Board of Education Contribution Requirement For FY 10 Based on
>
> Public Act 89-15 and Public Act 90-548        $307,485,000"

Third, page 11, section G of the report, entitled "Employer Contribution Requirements For Fiscal Year 2010," stated:

> "In past years, the Board of Education has made certain contributions to the pension fund from federal funds. Any contribution by the Board of Education from federal funds in FY 2010 is to be applied to the Board of Education required contribution of $307,485,000."

Based upon these clear statements in both the February 2009 letter and the actuarial report, plaintiff cannot credibly argue that it ever timely certified to the BOE $393,266,000 as the amount of the required BOE contribution for the 2010 fiscal year.

¶ 71    Plaintiff complains that the recent amendments to the Pension Code, which became effective April 14, 2010, do not provide any relief to the Fund for the fiscal year 2010 shortfall caused by the unexpectedly reduced contributions from the State. Specifically, plaintiff argues that the legislative amendment that set the BOE's fiscal year 2011 total contribution at $187 million, failed to account for the actuarial deficiencies for fiscal year 2010. Plaintiff's complaint, however, is unfounded.

¶ 72    "The language of the statute is the most reliable indicator of the legislature's objectives in enacting a particular law." *Tarsitano*, 385 Ill. App. 3d at 872. As discussed above, the statutory scheme anticipates that any shortfalls in BOE contributions for a given fiscal year will eventually be made up in subsequent years. The recent amendments to the Pension Code set forth specific amounts for the BOE's total required contribution to the Fund for three years. Those defined contribution amounts are: $187 million for fiscal year 2011, $192 million for fiscal year 2012, and $196 million for fiscal year 2013. 40 ILCS 5/17-129(b)(i), (b)(ii), (b)(iii) (West 2010). The legislature also extended to the year 2059 the time in which the Fund's asset-to-liability ratio should be raised to 90%. 40 ILCS 5/17-129(b)(iv) (West 2010).

¶ 73    I do not conclude that the absence of a provision that would have allowed the Fund to add

any contribution shortfall from fiscal year 2010 to the BOE's fiscal year 2011 total section 17-129 contribution indicates an oversight by the legislature. Where the legislature passed, on July 15, 2009, the State's fiscal year 2010 appropriations to the Fund (Pub. Act 96-042 (eff. July 15, 2009)), which were less than the amounts anticipated by the Fund, I cannot assume that the legislature was unaware of the 2010 shortfall on April 14, 2010 when it set the BOE's 2011 contribution at $187 million (Pub. Act 96-889 (eff. Apr. 14, 2010) (amending 40 ILCS 5/17-129 (West 2010))). Moreover, the plain language of the statute, as amended effective April 14, 2010, established a statutory scheme that suspended the process of calculating the BOE's section 17-129 contributions according to the projected unit credit actuarial cost method until fiscal year 2014, at which time the Fund will resume that process and bring the asset-to-liability ratio up to 90% by the end of fiscal year 2059. Furthermore, the legislature's express exclusion of any prior certified contribution by the Trustees for fiscal year 2011 (40 ILCS 5/17-129(b)(i) (West 2010)) indicates that the legislature similarly did not intend to allow the Trustees to recoup any shortfall from the certified contribution for fiscal year 2010 within that fiscal year.

¶ 74 I, like the trial court, would conclude that the BOE's timely certified required contribution for fiscal year 2010 was $307,485,000, and there is no genuine issue of material fact that the BOE paid that amount to the Fund. Accordingly, the BOE did not violate the Pension Code and, thus, the trial court properly denied the Fund's request for a declaratory judgment, an injunction, and a writ of *mandamus*.

¶ 75 Because the BOE paid its timely certified required contribution to the Fund, I would affirm the judgment of the circuit court that granted summary judgment in favor of defendants.